UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

UNITED STATES OF AMERICA     :
                             :
     v.                      :     File No. 1:03-CR-35-01
                             :
ANDREW CAPOCCIA              :
_____:

RULING ON GOVERNMENT'S MOTION FOR ISSUANCE
OF A PRELIMINARY ORDER OF FORFEITURE
(Paper 248)

Background

On April 5, 2005, a jury found defendant Andrew Capoccia guilty of Counts 1-5, 7, and 9-15 of the Second Superseding Indictment (hereinafter "the Indictment") filed in this case.  In Counts 19-23 and 25-30 of the Indictment, the government seeks forfeiture of specific property of the defendant as derived from proceeds traceable to his now proven criminal violations.  In addition, the government asks for a money judgment for additional, untraceable amounts proved to have been wrongfully taken from the various organizations operated and controlled by defendant Andrew Capoccia.

By a preponderance of the evidence adduced at trial and a forfeiture hearing held on December 7, 2005, the government has demonstrated the assets described _infra_ either are proceeds of the crimes for which the defendant was convicted or were involved in those crimes.  See Fed. R. Crim. P. 32.2(b)(1) ("The court's

1

determination may be based on evidence already in the record, including any written plea agreement or, if the forfeiture is contested, on evidence or information presented by the parties at a hearing after the verdict or finding of guilt."); see also United States v. Bellomo, 176 F.3d 580, 595 (2d Cir. 1999) (the court's fact finding at a forfeiture hearing is governed by a preponderance of the evidence standard).  In addition, the government has demonstrated defendant Andrew Capoccia misappropriated more money than it has been able to trace; therefore, the government is entitled to an additional money judgment which it may satisfy by the forfeiture of substitute assets.  See, e.g., 21 U.S.C. § 853(p)(providing for forfeiture of substitute property).  The accounts discussed in the following ruling are also referenced in the government's revised 12/07/2005 chart tracing the Law Centers' funds and entered into evidence at the December 7, 2005 forfeiture hearing.

### Findings of Fact

Throughout this decision, the term "Law Centers" refers to and encompasses the variety of legal entities controlled by defendant Andrew Capoccia at all relevant times between 1997 and 2002, including the following:  Beginning in February 1997, defendant Andrew Capoccia formed "Andrew Capoccia Law Centers, LLC."  In 1998, that firm changed its name to "Andrew F. Capoccia

2

Law Centers, LLC." That entity underwent additional name changes, including "Daly, Clingiryan, Murphy & Sinnott Law Centers, LLC." In June 2000, Capoccia sold the assets of this entity to a firm purportedly, but not actually, controlled by Howard Sinnott and which was known by several names, including "The Law Centers for Consumer Protection."

While actually controlled by the defendant, the Law Centers operated by contracting with clients, that is, individuals in debt who would provide retainer fees based on the savings the Law Centers planned to secure through representing their interests with creditors. For all entities operated by the defendant, "retainer accounts" and "general accounts" were not maintained separately and funds of various types and origins were commingled.

On December 31, 1998, Law Centers' books and records showed it had received $9,595,201 more in retainers than it had earned. The records also showed it had a total of $74,621 in all accounts except for the escrow accounts, which showed an actual balance of $4,013,372.

On December 31, 1999, Law Centers' books and records showed it had received $18,542,569 more in retainers than it had earned. The records also showed it had a negative balance of $13,791 in all accounts except for the escrow accounts, which showed a balance of $10,831,556.

3

On December 31, 2000, Law Centers' books and records showed it had received $20,496,477 more in retainers than it had earned. The records also showed it had a balance of $221,287 in all its accounts except for the escrow accounts, which showed a balance of $11,924,267. In addition, the Law Centers' April 2000 Strategic Plan referenced the firm's retainer deficit as being $19.8 million.

On December 31, 2001, Law Centers' books and records showed it had received $20,336,713 more in retainers than it had earned. The records also showed it had a negative balance of $340,208 in all its accounts except for escrow accounts, which showed an actual balance of $4,272,968. Notably, the records should have reflected a balance of $8,407,063 in the Law Centers' escrow accounts.

On January 28, 2003, Law Centers went bankrupt. As of that date, its records indicated the firm had received $18,665,057 in fees which it had not yet earned. In addition, on that date, it had a balance of $34,308 in its retainer accounts. While the records also showed the Law Centers should have had $5,527,962 in its escrow accounts, they only showed an actual balance of $975,378.

For each year at issue, the Law Centers suffered a loss. For example, in 1997 and 1998 combined, Law Centers had gross revenues, including earned and unearned retainer and maintenance

fees, of $10,963,199.  Total expenses during that period were
$8,522,345.  In that same period, total earnings from the
settlement of client debts were only $1,367,998, thereby
indicating a loss for years 1997-1998 of approximately
$7,154,347.  Calculated in a similar fashion, in 1999, the Law
Centers lost $10,443,306; in 2000, it lost $1,471,534; and in
2001, it lost $589,050.  In fact, the evidence is clear that,
from 1998 through the demise of the Law Centers, the firm never
had enough money in its escrow accounts to pay settlements with
client creditors which actually would have resulted in the firm
earning retainer monies it had already otherwise misappropriated.

Overall, between July 29, 1998 and May 23, 2000,
approximately $1,600,635 was transferred from Law Centers'
accounts to the defendant's wife, Carol Capoccia.  During that
same period, an additional $650,000 was transferred from Law
Centers' retainer accounts to pay Andrew and Carol Capoccia's
federal taxes, and $173,500 to pay their New York state taxes.

Between July 29, 1998 and January 4, 2000, approximately
$1,522,987 was deposited into a Key Bank account in the name of
"Carol Capoccia, LLC" with account number 325450040762
(hereinafter "Key Bank 0762").  These deposits were either made
electronically from Law Centers' accounts or with checks drawn on
Law Centers' accounts and made payable either to "cash" or "Carol
Capoccia."

In turn, between August 1998 and January 2000, approximately $637,000 was removed from Key Bank 0762 and deposited into a Key Bank money market account in the name of "Carol Capoccia LLC" and with account number 3254550015959 (hereinafter "Key Bank 5959"). From September 8, 1998 to May 31, 2000, Key Bank 5959 also received additional deposits totaling $97,648, all of which were generated from Law Centers accounts on checks made payable either to the defendant or his wife.

After a combination of direct deposits and indirect transactions, on September 28, 1999, a total of $220,000 found its way from Key Bank 5959 to McDonald Investment account number 622544346, an account which was later superseded by McDonald Investment account number 62203192 (hereinafter "McDonald 3192"). Carol Capoccia controlled both of these accounts.

On February 23, 1999, $200,000 was withdrawn from Key Bank 5959 by writing a check, the proceeds of which were divided between Carol Capoccia's personal investments at Nationwide Insurance and Hartford Life.  Between March 1999 and December 1999, an additional $90,000 was transferred from Key Bank 5959 to the Nationwide account and $80,000 to the Hartford Life account. On April 17, 2001, the contents of these two accounts, $169,697.34 from Nationwide and $167,219.95 from Hartford, were transferred to Wachovia Bank account number RSBCU0469 (hereinafter "Wachovia 0469"), another account in the name of

6

"Carol Capoccia LLC."  That total, in turn, was part of the
November 19, 2001 transfer of $1,598,007 from Wachovia 0469 to
Prudential account number TBJ 967131E6 (hereinafter "Prudential
31E6"), an account in the name of "Valentino Enterprises," yet
controlled by Carol Capoccia.

In late 1999, $173,500 in Law Centers' funds were used to
pay the defendant's New York state income taxes.  On March 19,
2001, a refund check from that tax payment was deposited into
Carol Capoccia's Wachovia 0469.

Similarly, between August 16, 1999 and February 22, 2000, a
total of $650,000 was transferred from Law Centers' accounts to
pay the defendant's taxes for 1997 and 1998.  On July 23, 2000,
an additional $102,703 was transferred from Law Centers' accounts
to pay defendant's remaining 1998 tax liabilities.  On January
2001, the defendant received two refund checks totaling $560,205,
representing overpayments to the IRS for tax years 1997 and 1998.
Those funds were deposited into Carol Capoccia's Prudential
account number 059-641204-46 (hereinafter "Prudential 04-46").

On December 27, 2000, $212,871 was transferred from McDonald
3192 to Prudential account number 059-644149-46, an account in
the name of "Mrs. Carol Capoccia, c/o Lady CC Investments"
(hereinafter "Prudential 49-46").  On March 13, 2001, $739,205
was transferred from Prudential 04-46 to Prudential 49-46.  On
March 19, 2001, $684,340 was transferred from Prudential 49-46 to

a third account under a similar name, Prudential account number
059-644190-46 (hereinafter "Prudential 90-46").  On June 1, 2001,
$100,000 was transferred from Republic Security Bank account
number 53150 (hereinafter "Republic 3150"), in the name of "Carol
Capoccia" to Prudential 90-46.  On July 2, 2001, another $200,000
was transferred from the same Republic account to the same
Prudential account.

Accordingly, a total of $984,340 can be traced from accounts
controlled by defendant's wife, Carol Capoccia, to Prudential 90-
46.  On October 1, 2001, $905,371 was transferred from that
Prudential account to Prudential Account number 059-644190-69,
which the government seized (hereinafter "Account 1").

Between May 24, 2000 and August 3, 2000, $325,000 was
transferred from Law Centers' retainer accounts to Carol
Capoccia's First Union Bank of Florida account number 9984912558
(hereinafter "First Union 2558").  From those funds, $102,703.98
was used to pay the defendant and his wife's 1998 federal tax
liabilities.  On January 22, 2001, the IRS sent refunds totaling
$560,205 to the defendant.  Those funds also are traceable
through Carol Capoccia's Prudential accounts into Account 1.

On August 11, 2000, approximately $231,300 in First Union
2558 was transferred to Carol Capoccia's Republic Security Bank
account number 11242 (hereinafter "Republic 1242").  Republic
1242 also received the following transfers: $140,000 from a Law

Centers' escrow account held at Chittenden Bank; $72,334 from
Carol Capoccia's First Union account number 9985142990, a sum
which represented proceeds from the sale of a large amount of Law
Centers' office furniture; and $460,000 from a Law Centers'
retainer account at PNC Bank.  Accordingly, Republic 1242
received a total of approximately $903,634 from Law Centers
sources.

On January 29, 2001, the $845,994 balance in Republic 1242
was transferred to Carol Capoccia's Republic 3150.  On April 2,
2001, $200,000 was transferred from Law Centers' Chittenden Bank
account number 53150, and on May 29, 2001, another $200,000 was
transferred from an account belonging to Howard Sinnott
containing unearned retainer money, to Republic 3150.  On June 14
and June 27, 2001, a total of $112,500 was transferred from a Law
Centers' retainer account to Republic 3150.  On February 5, 2001,
another $200,000 was transferred from a Law Centers' escrow
account at PNC Bank to Republic 3150.  Between July 11, 2001 and
July 23, 2001, a total of $150,000 was transferred from Law
Centers' PNC Bank retainer accounts to Republic 3150.  In all,
therefore, a total of $1,708,494 in Law Centers' funds is
traceable to Republic 3150.

On June 1, 2001, $300,000 was transferred from Republic 3150
to Carol Capoccia's Prudential 90-46.  Similar transfers of
$100,000 and $200,000 were made on June 1, 2001 and July 2, 2001

respectively.   On October 1, 2001, the contents of Prudential 90-
46 were transferred into Account 1, one of the accounts seized by
the government.

In addition, in three separate transactions, a total of
$1,000,000 was transferred from Republic 3150 to Wachovia 0469.
On March 1, 2001, $90,000 was transferred; on March 2, 2001,
$810,000 was transferred; and, on April 9, 2001, $100,000 was
transferred.   The money in Wachovia 0469 eventually became part
of a November 19, 2001 transfer of $1,598,007 from Wachovia 0469
to Prudential account number TBJ 967131E6 (hereinafter referred
to as "Account 2"), which was seized by the government.

After these transfers from Republic 3150, the balance of
that account became the balance of Wachovia account number 35-
740-093 (hereinafter "Wachovia 093") upon Wachovia Bank's
acquisition of Republic Savings Bank.   At that time, the balance
was approximately $172,679.   Between August 28, 2001 and February
6, 2002, $512,500 was deposited in Wachovia 093 from a Law
Centers' retainer account at PNC Bank in 14 separate
transactions.   Also, by two transfers of $100,000 each, processed
on September 17, 2001 and October 17, 2001, $200,000 was
transferred from Wachovia 093 to Wachovia 0469 (note that those
transfers predated the November 19, 2001 transfer of $1,598,007
from Wachovia 0469 to Account 2).   In any event, the government
seized Wachovia 093, making it "Account 3."

As another way to divert funds from Law Centers' accounts, during the years 2000 to 2001, Carol Capoccia maintained an American Express account number 3783408752-94005. The balance for that account was paid through automatic debits from Account 3 and from Republic Security Bank accounts funded by misappropriated Law Centers' money. Between August 2000 and November 2001, the defendant and his wife charged over $250,000 on the American Express card and paid its balance with Law Centers' money subject to forfeiture.

For example, between November 2000 and November 2001, Carol Capoccia used the American Express card to charge over $42,000 worth of the following items of jewelry:

(1)  Ladies platinum Pave ring with 1.5TWT diamonds;

(2)  Ladies 18K white gold triple tennis bracelet with 4.2TWT diamonds by Garavell;

(3)  18K white gold Pave hoop earrings with 3.42TWT diamonds;

(4)  18K white gold heart pendant with .89TWT diamonds by Roberto Coin;

(5)  6 Waterford Lismore brandy balloons - 12 oz.;

(6)  18K yellow gold heart pendant with .40TWT diamonds;

(7)  Chas Thomae beaded compact;

(8)  Reed and Barton silver plated travel photo album;

(9)  Ladies platinum bangle bracelet with 3.2TWT diamonds;

(10) A pair of gold south sea pearls 11.2mm; and

11

     (11) 14K white gold daisy pendant with 10.4mm golden south
          sea pearl with .39TWT diamond.

Those bills were paid by debits from Wachovia 093 and its

predecessor accounts.  In addition, between September 7, 2000 and

October 17, 2001, at least $75,000 was withdrawn from Wachovia

093 and its predecessor accounts and spent on improvements to the

Capoccias' residence at 56 Brentwood Drive East, Guilderland, New

York.

     On or about September 20, 2001, $100,000 was transferred

from Wachovia 093 to Carol Capoccia's Key Bank account number

325450051868 (hereinafter "Key Bank 1868").  On November 9, 2000,

an additional $10,000 was transferred into Key Bank 1868 from a

Law Centers' retainer account at PNC Bank.  Key Bank 1868 was

seized by the government and became "Account 4."

     In September and October 2001, Carol Capoccia withdrew

approximately $69,100 from Key Bank 1868, using a series of

checks made payable to "cash" or "Carol Capoccia" in amounts just

under the $10,000 limit which would trigger federal reporting

requirements.  After each withdrawal, the sum was deposited into

Key Bank account number 325490036895 (hereinafter "Key Bank

6895"), an account in the name of Carol Capoccia's son, Eugene A.

Bizzaro.  The government seized Key Bank 6895, and it became

"Account 5."

     Following these deposits of cash into Eugene Bizzaro's Key

Bank 6895, the account was debited seven times, resulting in the

12

transfer of $61,000 to E-Trade account number 1091-1898. Thereafter, Eugene Bizzaro withdrew $50,000 from the E-Trade account.  When the government seized this account, referred to as the E-Trade account, it contained approximately $4,450.  Later, however, Eugene Bizzaro delivered to the U.S. Marshals Service a check in the amount of $50,000, which, because it is traceable to Law Centers' retainer accounts, is subject to forfeiture, as is the E-Trade account.

Between September 11, 2001 and February 27, 2002, approximately $695,781 was transferred from Law Centers' PNC Bank retainer accounts to accounts held by Debt Services Associates (hereinafter "DSA").   Of the transfers to DSA accounts, over $414,000 went to DSA's operating account, PNC account number 8019327712.  The government has also seized that account and, as of the date of seizure, it contained $121,087.86.

On February 21, 2002, $25,000 was transferred from a DSA account to Carol Capoccia's Sun Trust Bank Account number 0417003221519 (hereinafter "Sun Trust 1519").  On March 1, 2002, another $60,000 was transferred from the DSA account to this same Carol Capoccia Sun Trust Account.

On or about March 19, 2002, $85,000 was transferred from Sun Trust 1519 to Carlo Spano, including the deposit of some funds into one of Spano's accounts at State Employee's Federal Credit Union.  When that credit union account was seized, it only contained $3,911.88.

13

## Conclusions

1.    Of the $922,127.55 seized from Account 1, $402,703 can be traced to money appropriated from the Law Centers after May 23, 2000. $300,000 can be traced to money from Republic 3150 on June 1, 2002 and July 2, 2001, then transferred to Prudential 90-46, and then to Account 1.  $102,703 can be traced to the July 23, 2000 tax payment to the IRS and the January 22, 2001 refund which was deposited into Carol Capoccia's Prudential 04-46, and then, after movement through two more Prudential accounts, to Account 1.  The remaining $589,424 in Account 1 came from money taken from the Law Centers' unearned retainer accounts before May 24, 2000.  This sum includes $212,871 from the McDonald accounts and $457,502 in additional tax refunds, for a total of $670,373, which is more than was seized in Account 1.

2.    Of the $1,596,505.59 seized from Account 2, $1,230,290 can be traced to money taken from the Law Centers after May 23, 2000.  $1,000,000 was transferred from Republic 3150 to Wachovia 0469 between March 1, 2001 and April 9, 2001, and then to Account 2.  An additional $200,000 was transferred from Account 3 to Wachovia 0469 on September 17, 2001 and October 17, 2001, in addition to $30,290 in earned account interest, and then deposited into Account 2.  The remaining $366,215 in Account 2 can be traced to money appropriated from Law Centers' retainer account before May 24, 2000, including the $107,480 in income tax refunds from the state of New York and the $336,917.29

14

transferred from the Nationwide and Hartford Life investment accounts.  The total, $444,397, is more than was seized in Account 2.

3.   All the amounts the government seized from other accounts can be traced to money taken from the Law Centers after May 23, 2000.

4.   As a result of his conviction on Count 1, defendant Andrew Capoccia caused at least $4,422,966 to be wrongfully withdrawn from the Law Centers' retainer accounts and other assets and deposited to accounts in the name of his wife, Carol Capoccia.  The traceable amounts include: (1) For money taken before May 24, 2000, $212,871 from McDonald accounts and $564,982 in tax refunds, which can be traced to Account 1, and $336,917 from Nationwide and Hartford Life can be traced into Account 2. For money taken after May 24, 2000, $402,703 ($300,000 from Republic 3150 and $102,703 from tax refunds) can be traced into Account 1.  $1,230,000 ($1 million from Republic 3150, $200,000 from Account 3, and approximately $30,000 in interest) can be traced to Account 2.  All the other seized assets are traceable to money taken after May 24, 2000, including Account 3, Account 4, the E-Trade account, the improvements to the Capoccias' home, the jewelry purchased by Carol Capoccia, the DSA operating account, and the Carlo Spano account.  The government has seized a total of approximately $2,842,167; including the cost of the jewelry and a $75,000 lien placed on the Capoccias' residence,

15

the government has traced $2,959,167.  As to Count 1, therefore, the government is entitled to a judgment for the remaining $1,463,799.

5.  As a result of his conviction on Count 2, the defendant wrongfully appropriated $314,000 from Law Centers' escrow accounts to cover Law Centers' payroll, wrongfully took $2,274,000 from Law Centers' escrow accounts to cover overdrafts in Law Centers' retainer accounts and wrongfully sent $1,700,000 to Carol Capoccia.  The government admits that the monies sent to Carol Capoccia are covered under Count 1, see supra, para. 4, and that the rest of the money cannot be traced.  See Paper 354 at para. 49.  Accordingly, as to Count 2, the government is entitled to judgment for the remaining sum of $2,588,000.

6.  As a result of his conviction on Count 3, the defendant wrongfully caused $314,000 to be taken from the Law Centers' escrow accounts to cover Law Centers' payroll.  Because none of that money can be traced, the government is entitled to a judgment of $314,000.  Because this $314,000 is the same sum referred to in relation to Count 2, this judgment on Count 3 shall be alternative to, and not in addition to, the $314,000 included in the court's monetary judgment on Count 2.

7.  As a result of his conviction on Count 4, on February 5, 2001, the defendant wrongfully caused $200,000 to be transferred from a Law Centers' escrow account to Carol Capoccia's Republic 3150.  The government admits that this sum

16

has already been taken into account in regard to the retainer accounts; therefore, the government is entitled to judgment for $200,000.  See Paper 354 at para. 51.

8.   As a result of his conviction on Count 5, the defendant wrongfully caused $800,000 in escrow funds held by the Law Centers for the benefit of its clients to be used to cover overdrafts in its retainer accounts.  $100,000 of that total can be traced from Republic 3150 to Wachovia 0469.  Because that transfer has already been covered by money traced from the Law Centers' retainer account, the government is entitled to judgment for $800,000.

9.   As a result of his conviction on Count 7, the defendant wrongfully caused $318,000 in escrow funds held by the Law Centers for the benefit of its clients to be used to cover overdrafts in its retainer accounts.  Because none of that money can now be traced, the government is entitled to judgment in the amount of $318,000.

10.  As a result of his convictions on Counts 9 and 10, the defendant wrongfully caused at least $520,840 to be diverted from client escrow accounts to retainer accounts and spent for improper purposes.  Because none of that money can now be traced, the government is entitled to judgment in the amount of $520,840.

11.  As a result of his conviction on Count 11, the defendant caused $359,000 to be wrongfully appropriated from the Law Centers' retainer accounts and given to Howard Sinnott.  Of

17

that amount, $200,000 has been traced from Howard Sinnott's account to Carol Capoccia's Republic 3150.   The remainder was traced to Howard Sinnott.   Therefore, the government is entitled to no additional judgment on this count.

12.   As a result of his conviction on Count 12, the defendant caused at least $110,000 to be wrongfully taken from the Law Centers' retainer accounts and given to Thomas Daly. Because none of that amount has been traced, the government is entitled to judgment in the amount of $110,000.

13.   As a result of his conviction on Count 13, the defendant wrongfully caused $165,853 to be taken from the Law Centers' retainer accounts and used to pay DSA's payroll. Because none of that amount has been traced, the government is entitled to judgment in the amount of $165,853.

14.   As a result of his convictions on Counts 14 and 15, the defendant wrongfully caused $85,000 in Law Centers' retainer funds to be sent first to DSA and then to Carol Capoccia.   Of the $85,000, only $3,911 has been traced; therefore, the government is entitled to judgment in the amount of $81,089.

15.   As described in paragraphs 1 through 14, the government is entitled to a money judgment in the total amount of $6,247,581.

The government's Motion for Issuance of a Preliminary Order of Forfeiture (Paper 248) is GRANTED.   A separate Preliminary Order of Forfeiture will be issued.

SO ORDERED.

Dated at Brattleboro, Vermont, this 2ND day of February, 2006.

J. Garvan Murtha
United States District Judge