UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA    :
   :
      v.    :    Criminal No. 1:03-CR-35-01
   :
ANDREW CAPOCCIA    :

RULING ON GOVERNMENT'S MOTION FOR ISSUANCE OF AN
AMENDED PRELIMINARY ORDER OF FORFEITURE
(Paper 593)

I.    Background

In 2002, the United States seized a number of bank accounts and other assets related to an investigation it was conducting into illegal transfers of monies by Defendant Andrew Capoccia and others. When the investigation ripened into a prosecution, those assets became the subject of forfeiture counts in the charging documents in the case. Trial began in March 2005, and on April 5, 2005, Andrew Capoccia was convicted on thirteen counts outlined in the Second Superseding Indictment (Paper 121). See Verdict Form (Paper 233). The crimes of conviction included conspiracy, mail and wire fraud, interstate transmittal and receipt of stolen property, and money laundering. His conviction on all counts was upheld on appeal. United States v. Capoccia, No. 06-0670-cr(L); 06-2296-cr-(CON), Summary Order at 7 (2d Cir. Sept. 19, 2007).

The Second Superseding Indictment included various forfeiture counts pertaining to specific property derived from the proceeds traceable to Capoccia's convictions. In the alternative, the United States sought forfeiture of substitute assets of the Defendant. (Paper 121 at Counts 19-23 and 25-30). Following Capoccia's conviction, the United States moved for issuance of a Preliminary Order of Forfeiture (see Paper 248) and supported that motion with

legal memoranda (Papers 249 and 356) and Findings of Fact (Paper 355). That motion was granted. In its Preliminary Order of Forfeiture, the Court found that the United States was entitled to a money judgment in the amount of $6,247,581, and forfeiture of a number of specifically identified assets that had been seized by the United States in 2002, including all of the Contents of Account No. 059-644190-69, in the name of or for the benefit of Carol Capoccia, LLC at Prudential Securities (hereinafter "Account 1"); and the Contents of Account No. TBJ967131E6, in the name of or for the benefit of Valentino Enterprises, Inc. at Prudential Securities (hereinafter "Account 2"). (Paper 381).[1] Following an evidentiary hearing in December 2005 on forfeiture issues (hereinafter "2005 Forf. Hrg.), the Court entered a Final Order of Forfeiture dated August 15, 2006, which was largely identical to the Preliminary Order of Forfeiture. (Paper 442).

Capoccia appealed the forfeiture order. See United States v. Capoccia, 503 F.3d 103, 105 n.1 (2d Cir. 2007). On September 19, 2007, the Second Circuit affirmed the Final Order of Forfeiture in part, vacated it in part and remanded for further proceedings consistent

---

[1] The remaining assets seized by the United States and subject to forfeiture under the Preliminary Order of Forfeiture include: Contents in Account No. 35-740-093, in the name of or for the benefit of Carol Capoccia, LLC, at Wachovia Bank ("Account 3"); Contents in Account No. 325450051868, in the name of or for the benefit of Carol Capoccia, LLC, at Key Bank ("Account 4"); Contents in Account No. 325490036895, in the name of or for the benefit of Eugene A. Bizzarro and/or Deana Bizzarro Karam, at Key Bank ("Account 5"); Contents in Account No. 0417003221519, in the name of or for the benefit of Carol Capoccia, at SunTrust Bank ("Account 6"); Contents in E-Trade Account No. 1091-1898, in the name of or for the benefit of Eugene A. Bizzarro, at E-Trade Securities, Inc. (the "E-Trade Account"); Jewelry, a Beaded Compact, a Silver Plated Travel Photo Album, and 6 Waterford Lismore Brandy Balloons; Improvements, in the Minimum Amount of $75,000, to 56 Bentwood Drive East, Guilderland, New York; U.S. Funds in the Amount of $50,000, in the Possession or Control of Eugene A. Bizzarro; Contents in Account No. 52164, in the name of or for the benefit of Carlo Spano, at State Employee's Federal Credit Union ("Account 7"); and the Contents of PNC Account No. 8019327712, the operating account for Debt Settlement Associates ("Account 8").

with its order.  Id. at 118.  The Second Circuit affirmed the forfeiture of property constituting proceeds, or property derived from proceeds, traceable to the counts of conviction for acts occurring on or after May 24, 2000, but vacated the order to the extent it ordered forfeiture under a proceeds theory for property constituting proceeds, or property derived from proceeds, traceable to conduct before that date.  In reaching its decision, the Second Circuit held that the District Court was entitled to rely upon evidence adduced at trial as well as evidence admitted during the forfeiture hearing.  Id. at 109-10.

The Court held an evidentiary hearing on the remanded forfeiture issues on July 29, 2009 (hereinafter "2009 Forf. Hrg.").  At that hearing, Special Agent Daniel Rachek of the Federal Bureau of Investigation (FBI) provided expert testimony tracing the proceeds of the crimes of conviction in seized accounts that also contained monies or other assets not linked to the crimes of conviction.  Special Agent Rachek also provided testimony in support of forfeiture of substitute assets pursuant to 21 U.S.C. § 853(p) and Fed. R. Crim. P. 32.2(e).  The United States also offered admissions by Capoccia in support of its substitute assets theory for forfeiture. The defense cross-examined Special Agent Rachek on one issue — the inclusion of a portion of a tax refund as an asset traceable to the counts of conviction.

II.     Findings of Fact

In or about February 1997, Capoccia formed a company, or firm, known as Andrew F. Capoccia, LLC.  In 1998, the firm changed its name to the Andrew F. Capoccia Law Centers, LLC.  The firm underwent additional name changes, including a change to the Daly, Cilingiryan, Murphy & Sinnott Law Centers, LLC.   In June, 2000, Andrew Capoccia sold the assets of the firm he had started to a firm seemingly controlled by Howard Sinnott.  This new firm also used a

variety of names, including The Law Centers For Consumer Protection or LCCP. The evidence at trial showed that the official change in ownership and control made no real change to the operations of the firm and that Andrew Capoccia remained in effective control of the firm from its inception to March 2002, except for a period of about one month in April 2001. For ease of reference, the term "LCCP" is used generally hereinafter to refer to one or more of the firms controlled by Capoccia up until March 2002.

The United States offered evidence at the forfeiture hearings (December 2005 and July 2009) and during the criminal trial (March - April 2005) tracing proceeds from the crimes of conviction. The evidence revealed that Accounts 1 and 2 were the only seized accounts that contained seized assets traceable to conduct that occurred before May 24, 2000. Exhibit 5658.[2] Counts 1 and 4 were the two counts in the Second Superseding Indictment that identified specific transactions involving proceeds that were traced to commingled accounts.[3] Accordingly, the July 2009 hearing focused largely on Counts 1 and 4, and Accounts 1 and 2.

---

[2] All referenced Exhibits are United States Government's Exhibits.

[3] Capoccia was also convicted of Counts 2-5, 7, and 9-15. Count 2 involved a conspiracy to commit wire and mail fraud, to transmit stolen money in interstate commerce, and to receive stolen money that had crossed a state boundary. The specific overt acts included transfers from LCCP's escrow account to its payroll account, general operating account, Debt Settlement Associates, and various other individuals, including accounts held by Carol Capoccia. Conviction under Count 2 thus involved transfers of money from LCCP to accounts controlled by Carol Capoccia; however, these transfers are also part of Counts 1 and 4. The conviction on Counts 3, 5, 7, and 9-13 do not implicate funds transferred to Accounts 1 and 2. The United States has already acknowledged that it will not use the proceeds theory to seek forfeiture of the $85,000 that is the subject of Counts 14-15. In any event, the transactions identified in Counts 14-15 do not implicate funds transferred to Accounts 1 and 2.

A.    Tracing Proceeds To Accounts 2 and 3

Using the Lowest Intermediate Balance Rule (LIBR), a well-accepted equitable tracing fiction approved by this Court for tracing proceeds through commingled accounts, the United States traced proceeds to Account 2 that arose from transactions beginning on May 24, 2000. Between May 24, 2000 and August 3, 2000, in four separate transactions, and as alleged in Count 1 of the Second Superseding Indictment, Andrew Capoccia transferred or directed the transfer of $325,000 from LCCP's retainer accounts to a Carol Capoccia account at First Union Bank of Florida, Account No. 9984912558 ("FUB account").  Exhibits 5617, 5658, 5658.B, 5658.C, 6131; Rachek Testimony, 2009 Forf. Hrg. at 32.  During that same time period, Carol Capoccia made a deposit of an additional $27,768 into the FUB account that was not linked to the counts of conviction.  Of that $27,768, approximately $20,000 was debited from the FUB account. Rachek Testimony, 2009 Forf. Hrg. at 40.

On July 31, 2000, Carol Capoccia used $102,703.98 from the FUB account to make a late payment toward Andrew and Carol Capoccia's 1998 tax liabilities to the IRS.  See Rachek Testimony, 2005 Forf. Hrg. at 15; Rachek Testimony, 2009 Forf. Hrg. at 27; Exhibits 5658 and 6131.

On or about August 11, 2000, the balance in the FUB account was $231,300.32.  That amount was transferred to and deposited into Republic Security Bank Account 11242 ("RSB 11242 account"), an account held by Carol Capoccia.  Of that amount, $223,532.30 was derived from the LCCP monies transferred between May 24, 2000 and August 3, 2000.  Carol Capoccia also deposited approximately $72,345 into the RSB 11242 account, which consisted of a transfer from another First Union Bank account not linked to the counts of conviction.  The remaining

portion of the deposit consisted of $7,768.02 left from Capoccia's non-proceeds balance in the FUB account. See Exhibit 6131 - 6131.A; Rachek Testimony, 2009 Forf. Hrg. at 27, 40.

On or about August 15, 2000, the total amount of unindicted monies in the RSB 11242 account was $80,112.70. The total amount of monies in the RSB 11242 account linked to transfers outlined in Count 1 of the Second Superseding Indictment was $223,629.63, including interest. See Exhibit 6131.A.

Between August 28, 2000 and November 30, 2000, Andrew Capoccia transferred or directed the transfer of $450,000, in three separate transfers, as alleged in Count 1 of the Second Superseding Indictment, from LCCP accounts to the RSB 11242 account. Exhibit 6131.A; Rachek Testimony, 2009 Forf. Hrg. at 33. During that same time period, Carol Capoccia had deposited an additional $15,081.94 that was not linked to the counts of conviction into the RSB 11242 account. See Exhibit 6131.A.

As of December 7, 2000, Carol Capoccia had written numerous checks or otherwise authorized debits on the RSB 11242 account that depleted the balance of all monies not linked to the counts of conviction. Her debits from that account then began to diminish the balance of the indicted proceeds in that account. As of December 7, 2000, the balance of indicted proceeds, plus interest, in the RSB 11242 account totaled $679,612.98. See Exhibit 6131.A-6131.B; Rachek Testimony, 2009 Forf. Hrg. at 41-42.

Between December 7, 2000 and January 24, 2001, Carol Capoccia continued to write checks and otherwise authorize debits from the indicted proceeds balance in the RSB 11242 account. She made no deposits during that time. The only deposits into that account were deposits of interest and a transfer on January 3, 2001 by Andrew Capoccia of $150,000 from an

LCCP account as alleged in Count 1 of the Second Superseding Indictment.  Exhibits 5658, 5658.B, 6131.C, 6132; Rachek Testimony, 2009 Forf. Hrg. at 33, 42.

On or about January 24, 2001, Carol Capoccia deposited $51,353.17 into the RSB 11242 account consisting of monies not linked to the counts of conviction.  Exhibit 6131.C; Rachek Testimony, 2009 Forf. Hrg. at 42.  At that time the balance of indicted proceeds in that account was $799,247.86.  Exhibit 6131.C.

Between January 24, 2001 and January 29, 2001, Carol Capoccia wrote checks or otherwise authorized debits from the RSB 11242 account, which reduced the balance of monies not linked to the counts of conviction to $44,751.74.  On or about January 29, 2001, the entire balance in the RSB 11242 account was transferred to Republic Security Bank Account 53150 ("the RSB 53150 account").  At that time, the balance of indicted proceeds was $801,242.45.  Exhibit 6131.D; Rachek Testimony, 2009 Forf. Hrg. at 30-31.

On or about February 5, 2001, Andrew Capoccia transferred, or directed the transfer of $200,000 from an LCCP account as alleged in Count 4 of the Second Superseding Indictment.  Exhibit 5658.B, 6131.D, 6132; Rachek Testimony, 2009 Forf. Hrg. at 34.  As of February 20, 2001, Carol Capoccia had written checks or otherwise authorized debits from the RSB 53150 account that depleted the balance of monies not linked to the counts of conviction.  At that time, the indicted proceeds balance in that account was $1,003,736.53.  Exhibit 6131.E.

Carol Capoccia continued to write checks and authorize debits from the RSB 53150 account through August 23, 2001, yet she made no further deposits of monies that were not linked to the counts of conviction.  All debits and checks from the RSB 53150 account beginning

on February 20, 2001 were drawn against the indicted proceeds balance. Exhibit 6131.E-K; Rachek Testimony, 2009 Forf. Hrg. at 43.

The authorized debits and checks Carol Capoccia drew from the RSB 53150 account included a transfer of $900,000 to Wachovia RSBCU0469, a trust account ("Wachovia trust account"), in two transactions between March 1, 2001 and March 2, 2001. Exhibits 5658, 6131.E; Rachek Testimony, 2009 Forf. Hrg. at 38. After these transfers, the remaining balance of the indicted proceeds in the RSB 53150 account was $83,927.62. Carol Capoccia continued to authorize further debits and write checks against this balance. Exhibits 5658, 6131.E-K.

On April 2, 2001, Andrew Capoccia transferred, or directed the transfer of $200,000 from an LCCP account to the RSB 53150 account, as set forth in Count 1 of the Second Superseding Indictment. All of the monies in the RSB 53150 account at that time constituted proceeds of the counts of conviction. On April 9, 2001, Carol Capoccia transferred an additional $100,000 to the Wachovia trust account, leaving a balance of $166,726.49 of indicted proceeds in the RSB 53150 account. Exhibits 5658, 6131.F, 6132.

On May 29, 2001, Andrew Capoccia transferred or directed the transfer of $200,000 from an LCCP account to the RSB 53150 account. Including this deposit, the balance of indicted proceeds in the RSB 53150 account was $331,421.12. Carol Capoccia continued to deplete the indicted proceeds remaining in the account. Among other debits, on June 1, 2001, Carol Capoccia transferred $100,000 from this account to Prudential Account 059-644190-46, a securities account she controlled. As will be described further, *infra*, shortly after Carol Capoccia made this transfer, the $100,000 was used to purchase securities that were held in that account. Those securities were eventually deposited into Account 1. Exhibits 5658, 6131.H.

8

Collectively, on June 14, 2001 and June 27, 2001, Andrew Capoccia transferred or directed the transfer of an additional $112,500 from an LCCP account into the RSB 53150 account, as set forth in Count 1 of the Second Superseding Indictment. Exhibits 5658, 6131.H. As of June 29, 2001, the balance of the indicted proceeds in the RSB 53150 account was $327,441.74. However, on July 2, 2001, Carol Capoccia transferred $200,000 of this amount to her Prudential Account 059-644190-46. As with the earlier transfer to this account, and as described *infra*, these monies were then used to purchase securities that ultimately found their way to Account 1. Exhibits 5658, 6131.H-I.

Between July 11, 2001 and August 24, 2001, Andrew Capoccia transferred or directed the transfer of $150,000, in a series of five transactions, from an LCCP account to the RSB 53150 account, as set forth in Count 1 of the Second Superseding Indictment.

On August 24, 2001, the balance in the RSB 53150 account was transferred to Wachovia Account 35-740-093 (Account 3). All of the monies deposited into Account 3 constituted indicted proceeds. Because Carol Capoccia continued to authorize debits and write checks drawn on the RSB 53150 account until she made this transfer, the balance of indicted proceeds in the RSB 53150 account transferred to Account 3 on August 24, 2001 was $172,679.35. Exhibits 5658, 6131.L; Rachek Testimony, 2009 Forf. Hrg. at 31-32, 36.

Between August 28, 2001 and September 7, 2001, Andrew Capoccia transferred or directed the transfer of $137,500, in two separate transactions, from an LCCP account to Account 3, as set forth in Count 1 of the Second Superseding Indictment. On September 17, 2001, Carol Capoccia transferred $100,000 from Account 3 to the Wachovia trust account. Because Capoccia wrote checks or authorized other debits from the Wachovia trust account between

August 24, 2001 and September 17, 2001, the balance remaining in Account 3 after the transfer on September 17, 2001, consisting entirely of indicted proceeds, was $174,875.11. Exhibits 5658, 6131.L-M, 6132.

On September 19, 2001, Andrew Capoccia transferred or directed the transfer of $12,500 from an LCCP account to Account 3 as set forth in Count 1 of the Second Superseding Indictment. On September 20, 2001, Carol Capoccia transferred $100,000 from Account 3 to Key Bank Account 325450051868 (Account 4). The balance of indicted proceeds in Account 3 after the transfer on September 19, 2001 was $80,079.44. Exhibits 5658, 6131.M, 6132.

Between September 20, 2001 and October 17, 2001, Andrew Capoccia transferred or directed the transfer of $112,500 in two separate transactions, from an LCCP account to Account 3, as set forth in Count 1 of the Second Superseding Indictment. Following the last of these two transfers, the balance of indicted proceeds in Account 3 was $152,644.88. Carol Capoccia continued to write checks and authorize debits from Account 3, including a transfer of $100,000 on October 17, 2001 to the Wachovia trust account. Exhibits 5658, 6131.O, 6132.

Between October 31, 2001 and February 14, 2002, Andrew Capoccia transferred or directed the transfer of $250,000, in nine separate transactions, from an LCCP account to Account 3, as set forth in Count 1 of the Second Superseding Indictment. Carol Capoccia continued to write checks or otherwise authorized debits from Account 3, reducing the balance of indicted proceeds. Exhibits 5658, 6131.

Account 3 received a total of $785,179 in indicted proceeds. The balance of indicted proceeds in Account 3 following the last transfer on February 14, 2002 was $99,115.13. Exhibits 5658, 6131.N-R, 6132.

The United States seized Account 3 in March 2002. All of the money seized in that account was traceable to conduct that occurred on or after May 24, 2000 and linked to the crimes of conviction. Exhibit 6131.E-R.

As noted above, indicted proceeds in the amount of $1,200,000 were transferred into the Wachovia trust account from the RSB 53150 account and from Account 3. In addition to these transfers, on April 17, 2001, the Capoccias deposited annuity payments from Hartford Insurance and Nationwide Insurance in the total amount of $336,917.29 into the Wachovia trust account; and on March 19, 2001, the Capoccias deposited their New York state tax refunds in the amount of $107,480 into the Wachovia trust account. Exhibit 5658; Rachek Testimony, 2009 Forf. Hrg. at 46-47. Debited from their deposit of the state tax refunds was a credit card payment made by Carol Capoccia on April 4, 2001 in the amount of $76,680. Exhibit 6130. The remaining amount of the state tax refunds and the annuity payments ($375,128.47) are not traceable to the crimes of conviction. Exhibit 6130; Rachek Testimony, 2009 Forf. Hrg. at 53.

Interest accumulated on the monies deposited in the Wachovia trust account. Because the monies in that account were commingled — *i.e.,* indicted proceeds were commingled with monies that were not the subject of the crimes of conviction — the United States offered unrebutted evidence of the interest attributable to the indicted proceeds in the Wachovia trust account. Exhibit 6129. The interest attributable to the indicted proceeds in the Wachovia trust account between April 2, 2001 and September 28, 2001 was $22,878.86 (out of a total interest payment of $30,289.61). Exhibit 6129; Rachek Testimony, 2009 Forf. Hrg. at 49-51.

On November 19, 2001, $1,598,007 was transferred from the Wachovia trust account to Account 2. Exhibit 5658; Rachek Testimony, 2009 Forf. Hrg. at 47. On that date, of that

amount, $1,222,878.86, or 76.53% of the monies in Account 2, constituted indicted proceeds. Exhibit 6130. Rachek Testimony, 2009 Forf. Hrg. at 11, 51-53.

Account 2 was seized in March 2002. Since that time, the balance in the account has fluctuated with the market.

B.     Tracing Proceeds to Account 1

Between August 16, 1999 and February 22, 2000 a total of $650,000 was transferred from LCCP retainer accounts to pay Andrew Capoccia's federal tax bills for 1997 and 1998. Exhibit 5658; Rachek Testimony, 2009 Forf. Hrg. at 54-55. As described above, on July 23, 2000, another $102,703 was transferred from Carol Capoccia's FUB account to the Internal Revenue Service to make a final payment toward Andrew Capoccia's 1998 taxes. See Exhibit 5658; Rachek Testimony, 2009 Forf. Hrg. at 59, 66-67; Rachek Testimony, 2009 Forf. Hrg. at 55.

On January 22, 2001, the IRS sent income tax refund checks to Andrew Capoccia for $477,305 (for the 1998 tax year) and $82,900 (for the 1997 tax year) for a total of $560,205. Those checks or their proceeds were deposited into Prudential Account 059-641204-46 ("the Pru 1 account"), in the name of Mrs. Carol Capoccia, LLC. See Rachek Testimony, 2005 Forf. Hrg. at 59-61; Rachek Testimony, 2009 Forf. Hrg. at 55-56; Exhibit 5658. Shortly after the refund was deposited, the monies were used to purchase securities that were then held in the Pru 1 account. Exhibit 6127; Rachek Testimony, 2009 Forf. Hrg. at 59.

On July 23, 2000, when Carol Capoccia made the final late tax payment, she did not have sufficient funds to cover this payment and used indicted proceeds to make the payment. Exhibit 6131; Rachek Testimony, 2009 Forf. Hrg. at 56. Using the LIBR to debit the full amount of the July 2000 tax payment against the indicted proceeds in the FUB account, and then credit that

12

amount as indicted proceeds when the Federal tax refund was issued, results in a transfer of indicted proceeds in the amount of $102,703 into the Pru 1 account. Rachek Testimony, 2009 Forf. Hrg. at 56.

Because the deposit on January 22, 2001 of $560,205 consisted of commingled monies — *i.e.,* $102,703 of indicted proceeds and the remainder being monies not traced to the counts of conviction — when the securities were purchased using the full amount of the deposit, a percentage of those securities constitutes indicted proceeds. Special Agent Rachek offered expert testimony that the percentage of indicted proceeds in those securities was 18.33%. Exhibits 5658, 6127; Rachek Testimony, 2009 Forf. Hrg. at 56.

On January 22, 2001, the Pru 1 account also contained securities purchased at an earlier date with monies not traceable to the crimes of conviction. Exhibit 6127; Rachek Testimony, 2009 Forf. Hrg. at 56, 59. The United States does not seek to forfeit those securities under a proceeds theory.

On March 13, 2001, the assets in the Pru 1 account were transferred to Prudential Account 059-644149-46 ("the Pru 2 account), also controlled by Carol Capoccia. No additional deposits were made into the Pru 2 account. On March 19, 2001, the assets in the Pru 2 account were transferred to Prudential Account 059-644190-46 ("the Pru 3 account"), another account controlled by Carol Capoccia. Exhibits 5658, 6127.

As noted above, on June 1, 2001, Carol Capoccia transferred $100,000 of indicted proceeds from the RSB 35150 account into the Pru 3 account where that money was immediately used to purchase shares in the Franklin New York Tax Free Income Fund-Class B. Rachek Testimony at 58-62 and 24-25; Rachek Testimony, 2009 Forf. Hrg. at 59-60; Exhibit 6127.C.

On July 2, 2001, Carol Capoccia transferred an additional $200,000 in indicted proceeds from the RSB 35150 account to the Pru 3 account, where that money was immediately used to purchase additional shares in the Franklin New York Tax Free Income Fund-Class B as well as bonds in Prudential Municipal Series Fund: New York Series: Class B. Rachek Testimony at 58-62 and 24-25; Rachek Testimony, 2009 Forf. Hrg. at 60; Exhibit 6127.D.

One hundred percent of the assets purchased in June and July 2001 in the Pru 3 account were purchased with indicted proceeds. Rachek Testimony, 2009 Forf. Hrg. at 59-60; Exhibit 6127.

On October 1, 2001, the assets in the Pru 3 account were transferred to Account 1. That account was seized in March 2002. Since that time, the value of the assets in Account 1 has fluctuated with the market.

The United States traced the following assets back to the crimes of conviction:

> (1) full value of the Franklin New York Tax Free Income Fund-Class B and Prudential Municipal Series Fund: New York Series: Class B (or whatever names these securities are currently titled);[4] and
>
> (2) 18.33% of the following thirteen securities—Davis NY Venture Fund Ince-Class B, Davis Ser INC FINL FD Class B, Dreyfus Laurel Funds Trust Premiere Core Value Fund Class B, Dreyfus Premier Technology Growth Fund Class B, Eaton Vance Mutual Funds Inc-Tax Managed Int'l Grown Fund-Class B, Fidelity Advisor Dividend Growth Fund Class B, Fidelity Advisor Dynamic Capital Appreciation Fund-Class B, MFS Series Trust VII Capital Opportunity Fund Class B, Prudential Health Sciences Fund Class B, Prudential Jennison Equity Opportunity Fund-Class B, Prudential Jennison Growth Fund Inc–Class B, Prudential US Emerging

---

[4]Defense counsel stipulated to submission of records from Wachovia Securities identifying the current titles. See Rachek Testimony, 2009 Forf. Hrg. at 63.

Growth Fund–Class B, and Prudential Utility Fund–Class B (or whatever names these securities are currently titled).[5]

Exhibit 6127; Rachek Testimony, 2009 Forf. Hrg. at 11.

C.    Other Seized Assets Traceable to the Crimes of Conviction

All the assets seized from all other accounts, most of the jewelry seized and at least $75,000 in improvements to the Capoccia residence are traced to money taken from LCCP on or after May 24, 2000.

During the years 2000 to 2001, Carol Capoccia maintained an American Express account, No. 3783408752-94005. That account was paid through automatic debits from Account No. 3 and the RSB 11242 and 53150 accounts. Between November 2000 and November 2001, Carol Capoccia spent over $42,000 on the following:

1)    Ladies Platinum Pave Ring with 1.5TWT Diamonds (purchased November 2001);

2)    Ladies 18K White Gold Triple Tennis Bracelet with 4.2TWT Diamonds by Garavell (purchased November 2001);

3)    18K White Gold Pave Hoop Earrings with 3.42TWT Diamonds (purchased November 2001);

4)    18K White Gold Heart Pendant with .89TWT Diamonds by Roberto Coin (purchased November 2001);

5)    6 Waterford Lismore Brandy Balloon - 12 oz. (purchased June 2001);

6)    18K Yellow Gold Heart Pendant with .40TWT Diamonds (purchased May 2001);

7)    Chas Thomae Beaded Compact (purchased December 2000);

8)    Reed and Barton Silver Plated Travel Photo Album (purchased December 2000);

---

[5]See footnote 4, above.

15

9) Ladies Platinum Bangle Bracelet with 3.2TWT Diamonds (purchased December 2000);

10) A Pair of Golden South Sea Pearls 11.2mm (purchased November 2000); and

11) 14K White Gold Daisy Pendant with 10.4mm Golden South Sea Pearl with .39TWT Diamond (purchased November 2000)

by charging the items on that same American Express card. Those bills were paid by debits on Account 3 and the predecessor RSB 11242 and 53150 accounts. See Exhibits 5658, 6131; Rachek Testimony, 2005 Forf. Hrg. at 35-38.[6]

Throughout 2001, at least $75,000 was taken from Account 3 or from indicted proceeds in the predecessor RSB 11242 and 53150 accounts and spent on improvements to the residence shared by Andrew and Carol Capoccia, at 56 Brentwood Drive East, Guilderland, New York. Exhibits 5658, 6131; see also Rachek Testimony, 2005 Forf. Hrg. at 36-39.

As noted above, on or about September 20, 2001, $100,000 was transferred from Account # 3 to Account 4. Other small payments were made into this account from Account 3. Rachek Testimony, 2005 Forf. Hrg. at 39-41. An additional $10,000 was transferred into this Key Bank account from an LCCP retainer account at PNC Bank on November 9, 2000. Exhibits 5617, 5658; Rachek Testimony 2005 Forf. Hrg. at 40-41. All the money in Account 4 at the time it was seized is traceable to the crimes of conviction.

---

[6] This finding was supported by an LIBR analysis, see Exhibit 6131. That analysis revealed that, arguably, one AMEX bill was paid with monies not linked to the counts of conviction. Exhibit 6313.D. That payment included payment for items 7, 8, and 9 above, purchased in December 2000. See Forf. Hrg. at 84 referencing jewelry receipts. Accordingly, the United States has stated it will seek forfeiture under a proceeds theory only for jewelry items 1-6 and 10-11 above. Items 7, 8 and 9 will be sought through the substitute assets theory.

From September to October, 2001, in the space of 22 days, Carol Capoccia withdrew about $69,100 from Account 4 by a series of checks to cash or to Carol Capoccia. Each check was for an amount just under $10,000 and Carol Capoccia then converted them to cash. In each case, the identical amount of currency was then deposited into Account 5 — Key Bank Account No. 325490036895, in the name of Eugene A. Bizzarro, Carol Capoccia's son. All the money in Account 5 at the time it was seized is traceable to money taken from the retainer or escrow accounts of LCCP. Rachek Testimony, 2005 Forf. Hrg. at 41-43.

Following the deposits of cash into Account 5, that account was then debited seven times for a total of $61,000 for a transfer to E-Trade Account No. 1091-1898 at E-Trade Securities, Inc. A sum of $50,000 was then removed from the E-Trade account by Eugene Bizzarro. Rachek Testimony, 2005 Forf. Hrg. at 43-44. Only about $4,450 was in the account when it was seized. In addition to the money seized from the E-Trade account, Eugene Bizzarro delivered a check for $50,000 to the Marshals Service. Rachek Testimony, 2005 Forf. Hrg. at 44. Both the money in the E-Trade account and the $50,000 are traceable to funds taken from the crimes of conviction.

Between September 11, 2001 and February 27, 2002, approximately $695,781 was transferred from LCCP's retainer accounts at PNC Bank to accounts held by Debt Settlement Associates (DSA). See Exhibit 5698; Rachek Testimony, 2005 Forf. Hrg. at 44-46. Additional money was spent by LCCP to cover other DSA expenses. Of the transfers to DSA accounts, over $414,000 went to DSA's operating account, PNC Account No. 8019327712 (Account 8), one of the seized accounts. Exhibit 5658; Rachek Testimony, 2005 Forf. Hrg. at 44-46.

D.    Money Judgment

This Court's Final Order of Forfeiture dated August 15, 2006 (Paper 442) awarded the United States an *in personam* money judgment in the amount of $6,247,581. That award was not overturned on appeal. However, the amount of the award should be amended to reflect the following, more accurate, computation derived from comparing the counts of conviction: (1) Capoccia's conviction on Count 1 reflects $2,100,000 in fraud proceeds; (2) Count 2 reflects an additional $3,448,000 not already accounted for in Count 1; (3) Counts 3-5 reflect no additional amounts of proceeds not accounted for in Counts 1 and 2; (4) Counts 9 and 10 identify $520,840 additional fraud proceeds; (5) Count 11 reflects $159,000 of additional fraud proceeds but the Government declined to seek forfeiture of this amount as part of the money judgment; (6) Count 12 established $110,000 in fraud proceeds not already accounted for in the above noted counts; and (7) the money identified in Count 13 is already encompassed in Count 2.[7]  Altogether, these amounts have a total sum of $6,178,840.

E.    Substitute Assets

The evidence offered at the trial and in the two forfeiture hearings in this case establishes Andrew Capoccia has an interest in Accounts 1 and 2 and that the United States has exercised due diligence in searching for the assets taken by Defendant. Andrew Capoccia's interest in the assets in Accounts 1 and 2 is evidenced by his statement in the Second Circuit Court of Appeals on August 7, 2001 (signed by Andrew Capoccia on July 27, 2007) affirming under penalty of perjury that he had a sufficient interest in property seized by the United States in 2002 to assert a

---

[7]The United States has recently indicated that it no longer seeks a money judgment for the additional $85,000 in fraud proceeds outlined in Counts 14-15.

due process violation.  He also filed a Verified Claim in the related civil forfeiture action, Docket No. 1:02-cv-72, in which he verified that he had an interest in the assets in Accounts 1 and 2, as well as all other property seized by the United States in March 2002.  United States v. Contents in Acct No. 059-644190-69, No. 1:02-cv-72, Paper 30 (D.Vt. May 28, 2002).   In addition, Capoccia testified during the trial in this matter that he transferred his assets into his wife's name to make himself judgment proof in the event that pending litigation resulted in a judgment against him.  He also wanted his wife to learn about the family financial matters.   Exhibit 6135.

The evidence also showed that as a result of the Defendant's actions, additional assets beyond those assets seized in March 2002 cannot be located, have been placed beyond the jurisdiction of this Court, have been substantially diminished in value, have been transferred, sold to or deposited with a third party, or have been commingled with other property that cannot be divided without difficulty.  Rachek Testimony, 2009 Forf. Hrg. at 65-67.

The expenditures reflected in the checking account summary for the FUB account, the RSB 11242 and 53150 accounts and Account 3 reveal that substantial payments were made on Andrew Capoccia's behalf for taxes, house renovations, credit card payments, insurance payments, and similar types of household expenses.   Exhibit 6131; Rachek Testimony, 2009 Forf. Hrg. at 66-67.

On February 21, 2002, $25,000 was transferred from DSA to Account No. 0417003221519 at Sun Trust Bank, in the name of Carol Capoccia (Account 6).  On March 1, 2002, another $60,000 was transferred from the DSA account to Account 6.  See Rachek Testimony, 2005 Forf. Hrg. at 47.  On or about March 19, 2002, the date of the search of the Capoccia residence, $85,000 was transferred to the control of Carlo Spano and part of it was

eventually deposited in an account at the SEFCU credit union (Account 7) in the name of Carlo Spano. When it was seized, Account 7 only had $3,911.88.[8] See Rachek Testimony, 2005 Forf. Hrg. at 47-49.

III.  Conclusions of Law

The United States seeks a money judgment for the total amount of monies identified in the counts of conviction. This judgment will be offset by monies forfeited under two theories: (1) a proceeds theory under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)[9] for all assets traceable to post-May 23, 2000 acts identified in the counts of conviction; and (2) a substitute assets theory under 21 U.S.C. § 853(p)[10] and Fed. R. Cr. P. 32.2(e) for the remaining seized assets (i.e., those that cannot be traced to post-May 23, 2000 conduct).

A.  The Money Judgment

This Court has already issued a money judgment in this case, a ruling that was not overturned by the Second Circuit. See generally, United States v. Capoccia, 503 F.3d 103 (2d Cir. 2007). In the remanded forfeiture proceeding, however, Capoccia challenged the authority of this Court to issue a money judgment. Following briefing by the parties, this Court ruled a

---

[8]  The Sun Trust account, Account 6, had been depleted by the time of seizure. Therefore, there are no assets in Account 6 to forfeit. The only asset remaining from the February 21, 2002 transaction is Account 7.

[9] Section 2461(c) "authorizes criminal forfeiture as a punishment for any act for which civil forfeiture is authorized, and allows the government to combine criminal conviction and criminal forfeiture in a consolidated proceeding." United States v. Razmilovic, 419 F.3d 134 (2d Cir. 2005). Thus, the United States may seek criminal forfeiture for violations of 18 U.S.C. § 2314 because 18 U.S.C. § 981(a)(1)(C) allows for civil forfeiture of proceeds traceable to an offense constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), which in turn refers to 18 U.S.C. §1961 (referencing, among other provisions, section 2314).

[10] 21 U.S.C. § 853(p) is applicable through 28 U.S.C. § 2641(c). See also Paper 533.

money judgment is an available remedy in this proceeding.  See Ruling on Authority to Issue Money Judgment and to Order Forfeiture of Substitute Assets, Paper 533.

The proper amount of an *in personam* money judgment is the full amount of the criminal proceeds — *i.e.,* all of the monies improperly taken on or after May 24, 2000 — and it is not limited by the value of the proceeds in the seized accounts that can be traced to the crimes of conviction.  United States v. Vampire Nation, 451 F.3d 189, 201-02 (3d Cir. 2006) ("The judgment *in personam* here is one in forfeiture and is limited by the provisions of 21 U.S.C. 853(a).").

Based upon a comparison of the counts of conviction, the United States is entitled to a money judgement in the total amount of $6,178,840.  Because the United States also seeks an order of forfeiture, the money judgment shall be offset by the value of the forfeited assets.

B.      Tracing Under the Proceeds Theory

The Second Circuit affirmed the forfeiture of property constituting proceeds, or property derived from proceeds, traceable to the crimes of conviction — *i.e.*, traceable to acts occurring on or after May 24, 2000.   However, pursuant to the Second Circuit's remand order, the proceeds theory requires the United States to trace the funds transferred on or after May 24, 2000 to the seized assets.  See United States v. Capoccia, 503 F.3d 103  (2d Cir. 2007).

The evidence at the July 2009 forfeiture hearing established that of the seized accounts, only Accounts 1 and 2 contain assets traceable to money taken both before and after that date.  Account 3 is implicated in the tracing analysis for commingled assets because some of the monies flowing through Account 3 were ultimately transferred to Account 2.

Tracing proceeds through commingled monies in bank accounts is typically accomplished by means of a tracing fiction, and this Court approved the use of the Lowest Intermediate Balance Rule (LIBR) in this proceeding, see Order on Remanded Forfeiture Issues (Paper 555) at 1. Under this methodology, funds are traced into and through a bank account so long as the balance over time in the account is never depleted of unlawful proceeds traced into it. The LIBR permits the United States to deduct debits in a checking account from the balance of monies not linked to the counts of conviction. When that balance is depleted, debits must be deducted from the indicted proceeds balance. So long as the account retains a balance of indicted proceeds, that balance can be traced to subsequent transfers.

Through exhibits and expert testimony, the United States has proven that indicted proceeds could be traced from LCCP accounts through various bank accounts controlled by Carol Capoccia and eventually into Account 2. Of the assets contained in Account 2, the United States has met its burden of showing by a preponderance of the evidence that 76.53% of the assets in Account 2 are forfeitable as proceeds traced to the crimes of conviction.

The assets in Account 1 are comprised of securities and bonds. Through exhibits and testimony, the United States has proven that indicted proceeds were used to purchase a percentage of thirteen securities and the full value of two additional assets. First, the Capoccias made a tax payment in July 2000 on overdue taxes from 1998. That payment, in the amount of $102,703, was drawn from the FUB account where there were insufficient funds to cover the payment without using indicted proceeds. The Government's expert witness testified he used the LIBR method to allocate that payment to indicted proceeds, and he then treated the payment to the IRS as a deposit in an account.

The IRS refunded $477,305 from the tax payments made toward the 1998 taxes, and this Court has ruled, over Defendant's objection, that the Government is entitled to recoup the full $102,703 from that amount. As a matter of equity, a defendant who launders stolen money by making a payment to the IRS, and then receives a refund from the IRS should be required to disgorge the full amount of the stolen and laundered funds. See In re Moffitt, Zwerling & Kemler, P.C., 875 F. Supp. 1152, 1160 (E.D. Va. 1995), aff'd in pertinent part, 83 F.3d 660 (4th Cir. 1996) (a defendant should not be rewarded simply because he has created a tangled web of financial transactions that make tracing difficult). Such a ruling here is consistent with this Court's earlier opinion in the civil forfeiture case where the Court stated: "While the Government is unable to cite any precedent to support its claim of forfeitability of a tax refund in this situation, there is no reason to think that funds laundered through the IRS are somehow immune from seizure. Where an individual paid taxes with tainted funds, traceable to proscribed conduct, and receives a refund for all or part of those taxes, the refunded money is no less seizable for having passed through the IRS." United States v. Contents in Account No. 059-644190-69, No. 1:02-cv-72, Ruling on Showing of Cause Why Funds Should Not Be Returned, Paper 100 (D. Vt. May 28, 2003).

The tax refund payment was commingled with a refund from a prior tax year and then used to purchase thirteen securities. The Government's expert witnessed testified that the percentage allocated to the Government's share of that purchase based on recouping the $102,703 in indicted proceeds was 18.33%. This percentage was calculated by taking the percentage of the Government's interest, $102,703, from the full amount used to purchase the securities.

Second, indicted proceeds were used to purchase securities and bonds in the Pru 3 account in June and July 2001.  These assets are wholly forfeitable as proceeds traced to the crimes of conviction.

The United States also established that assets in Accounts 3 through 5 and 8 constitute proceeds, or are derived from proceeds arising from the crimes of conviction.  The United States also established that most of the jewelry it seized was purchased with proceeds arising from the counts of conviction.  The United States has further established that Capoccia's residence has been improved with proceeds arising from the counts of conviction in the amount of at least $75,000.

C.    Forfeiture of Substitute Assets

The United States is entitled to an order of forfeiture of substitute assets to cover the remaining balance of assets in Accounts 1 and 2, three items of jewelry, and the contents of Account 7, none of which are traceable in this criminal forfeiture proceeding under the proceeds theory.  This Court determined in a prior ruling that it has the authority to order forfeiture of substitute assets.  See Ruling on Authority to Issue Money Judgment and to Order Forfeiture of Substitute Assets, Paper 533.  Indeed, pursuant to 21 U.S.C. § 853(p) and Fed. R. Crim. P. 32.2(e)(2), the Court must order the forfeiture of substitute assets upon a showing that satisfies the statutory requirements.

The burden rests with the United States to show that an order of forfeiture for substitute assets is warranted in this case.  Fed. R. Crim. P. 32.2(e)(2).  Specifically, the United States must show that the property at issue is property in which Capoccia has an interest and that as a result of Capoccia's acts or omissions, additional proceeds of the crimes of conviction either cannot be

24

located upon the exercise of due diligence, have been transferred or sold or deposited with a third party, placed beyond the jurisdiction of the court, substantially diminished in value, or commingled with other property that cannot be divided without difficulty. 21 U.S.C. § 853(p)(1).

The evidence presented at the forfeiture hearings established that Andrew Capoccia has an interest in the assets held in Accounts 1, 2 and 7, and in the three items of jewelry seized that were not traceable as proceeds under the LIBR. First, he directed the transfers from LCCP into accounts in his wife's name. Second, taking judicial notice of prior filings by Capoccia, see 2009 Forf. Hrg. at 87-88, and under the doctrine of judicial estoppel, Capoccia's prior statements and admissions in this and the related civil forfeiture case establish that he has an interest in the seized assets. He filed a verified claim asserting an interest in all the seized assets, including the jewelry, and represented to the Second Circuit on appeal that he had a property interest in the assets seized. During the trial, he testified that he put all of his bank accounts into his wife's name in an effort to become judgment proof in litigation and to assist her in learning how to handle the family finances. Finally, the evidence showed that many withdrawals from the various accounts in his wife's name were for his benefit. In fact, Capoccia's conviction on Count 4, receipt of stolen monies that had crossed state lines, establishes that, after hearing all the evidence at trial, the jury believed that the deposit of $200,000 into an account that he put into his wife's name constituted a receipt by him.

The evidence also revealed that although some of the proceeds of the crimes of conviction were transferred in a series of transactions into the seized accounts, a considerable amount of the fraudulent transfers went to cover LCCP operating costs and thus were dissipated

or transferred to third parties.  Even of the amounts transferred into accounts in Carol Capoccia's name, a considerable share of that money was spent by the Capoccias.  After exhaustive investigation, the only proceeds located by the United States were those that were seized in 2002.

Accordingly, the United States has met its burden of showing that the balance of assets in Accounts 1 and 2 that cannot be forfeited as proceeds, the contents of Account 7 and three items of jewelry are forfeitable as substitute assets.

IV.     Conclusion

In sum, the United States is entitled to a money judgement in the total amount of $6,178,840.  Because the United States also seeks an order of forfeiture, the money judgment shall be offset by the value of the forfeited assets.

Of the assets contained in Account 2, the United States has met its burden of showing by a preponderance of the evidence that 76.53% of the assets in Account 2 are forfeitable as proceeds traced to the crimes of conviction.  The United States has also proven that 18.33 % of thirteen securities and 100% of one security and one bond in Account 1 are forfeitable as proceeds traceable to the crimes of conviction.  In addition, the United States has proven that 100% of the value of assets in Accounts 3-5 and 8 are forfeitable as proceeds traceable to the crimes of conviction.  Also forfeitable as proceeds traceable to the crimes of conviction are a number of items of jewelry, and at least $75,000 in improvements to the Capoccia residence.

As to the remaining seized assets, the United States has met its burden of proving that they should be forfeited as substitute assets under 21 U.S.C. § 853(p).

SO ORDERED.

Dated at Brattleboro, Vermont, this 19th day of August, 2009.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
Senior United States District Judge